IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
HARRISONBURG DIVISION

| | | |
|---|---|---|
| PHILIP STONESTREET, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 5:12-CV-111 |
| | ) | |
| CAROLYN W. COLVIN,[1] | ) | |
| Acting Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

**REPORT AND RECOMMENDATION**

Plaintiff Philip Stonestreet ("Stonestreet") filed this action challenging the final decision of the Commissioner of Social Security ("Commissioner") finding him not disabled and therefore ineligible for disability insurance benefits ("DIB") under the Social Security Act ("Act"). 42 U.S.C. §§ 401–433. Specifically, Stonestreet alleges that the Administrative Law Judge ("ALJ") erred in weighing the opinion of a consulting psychologist, and improperly relied on the Medical-Vocational Guidelines in finding that jobs exist in significant numbers in the national economy that Stonestreet could perform.

This court has jurisdiction pursuant to 42 U.S.C. § 405(g). This case is before me by referral pursuant to 28 U.S.C. § 636(b)(1)(B). The parties have fully briefed all issues and the case is now ripe for decision. I have carefully reviewed the administrative record, the legal memoranda, and the applicable law. I conclude that substantial evidence supports the ALJ's decision and that the decision on all grounds. As such, I **RECOMMEND DENYING**

---

[1] Carolyn W. Colvin became the Acting Commissioner of Social Security on February 14, 2013. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Carolyn W. Colvin is hereby substituted for Michael J. Astrue as the defendant in this suit.

1

Stonestreet's Motion for Summary Judgment (Dkt. No. 10), and **GRANTING** the Commissioner's Motion for Summary Judgment.  Dkt. No. 15.

## STANDARD OF REVIEW

Section 405(g) of Title 42 of the United States Code authorizes judicial review of the Commissioner's denial of social security benefits.  Mastro v. Apfel, 270 F.3d 171, 176 (4th Cir. 2001).  This Court limits its review to determining whether substantial evidence exists to support the Commissioner's conclusion that Stonestreet failed to demonstrate that he was disabled under the Act.  "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion; it consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance."  Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996) (internal citations omitted).  If such substantial evidence exists, the final decision of the Commissioner must be affirmed.  Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990).

Stonestreet bears the burden of proving that he is disabled within the meaning of the Act. English v. Shalala, 10 F.3d 1080, 1082 (4th Cir. 1993) (citing 42 U.S.C. § 423(d)(5)).  The Act defines "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment, which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).  Disability under the Act requires showing more than the fact that the claimant suffers from an impairment which affects his ability to perform daily activities or certain forms of work.  Rather, a claimant must show that his impairments prevent him from engaging in all forms of substantial gainful employment given his age, education, and work experience.  See 42 U.S.C. §§ 423(d)(2), 1382c(a)(3)(B).

The Commissioner uses a five-step process to evaluate a disability claim.  Walls v. Barnhart, 296 F.3d 287, 290 (4th Cir. 2002).  The Commissioner asks, in sequence, whether the

claimant: (1) is working; (2) has a severe impairment; (3) has an impairment that meets or equals the requirements of a listed impairment; (4) can return to his past relevant work; and if not, (5) whether he can perform other work. Johnson v. Barnhart, 434 F.3d 650, 654 n.1 (4th Cir. 2005) (per curiam) (citing 20 C.F.R. § 404.1520); Heckler v. Campbell, 461 U.S. 458, 460–62 (1983). The inquiry ceases if the Commissioner finds the claimant disabled at any step of the process. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). The claimant bears the burden of proof at steps one through four to establish a prima facie case for disability. The burden shifts to the Commissioner at step five to establish that the claimant maintains the Residual Functioning Capacity ("RFC"), considering the claimant's age, education, work experience, and impairments, to perform available alternative work in the local and national economies. 42 U.S.C. § 423(d)(2)(A); Taylor v. Weinberger, 512 F.2d 664, 666 (4th Cir. 1975).

## STATEMENT OF FACTS

### Social and Vocational History

Stonestreet was born on June 30, 1958 (Administrative Record, hereinafter "R." at 147), and was considered a "younger person"[2] under the Act as of his alleged onset date, and became an "individual closely approaching advanced age"[3] by the time of the ALJ's decision. R. 21; 20 C.F.R. §§ 404.1563(c), 404.1463(d). Stonestreet's last date insured is March 31, 2014 (R. 15); therefore he must show that his disability began before the end of his insurance period, and existed for twelve continuous months to receive DIB. 42 U.S.C. §§ 423(a)(1)(A), (c)(1)(B), (d)(1)(A); 20 C.F.R. §§ 404.101(a), 404.131(a). Stonestreet has a high school education, completed some college coursework, obtained a fire and rescue certificate, and received

---

[2] The regulations state that "if you are a younger person (under age 50), we generally do not consider that your age will seriously affect your ability to adjust to other work." 20 C.F.R. § 404.1563(c).

[3] "If you are closely approaching advanced age (age 50–54), we will consider that your age along with a severe impairment(s) and limited work experience may seriously affect your ability to adjust to other work." 20 C.F.R. § 404.1563(d).

vocational training in concrete and asphalt. R. 32. Stonestreet previously worked as a concrete and asphalt technician, commercial driver, and warehouse worker. R. 33–35, 217–20. Stonestreet reported that during the relevant period, he had the capacity to drive a car, prepare meals, go to church, go shopping, cut the grass, look for jobs, and feed his dogs. R. 33, 36, 40–42, 230–34, 437. Stonestreet testified that he went to Alcoholic Anonymous ("AA") meetings at least four days a week. R. 42.

## Claim History

Stonestreet protectively filed for DIB on April 4, 2008, claiming that his disability began on March 19, 2008. R. 203. The state agency denied his application at the initial and reconsideration levels of administrative review. R. 101, 109. On July 26, 2010, ALJ Drew A. Swank held a hearing to consider Stonestreet's disability claim. R. 27–55. Stonestreet was represented by an attorney at the hearing, which included testimony from Stonestreet but no vocational expert. R. 28–55.

On September 3, 2010, the ALJ denied Stonestreet's claims. R. 22. The ALJ found that Stonestreet suffered from the severe impairments of degenerative disc disease of the lumbar spine, major depressive disorder, and alcohol-based substance abuse disorder. R. 16. The ALJ found that these impairments, either individually or in combination, did not meet or medically equal a listed impairment. R. 22. The ALJ further found that Stonestreet retained the residual functional capacity ("RFC") to perform a range of light, unskilled work activity that:

> requires no climbing of ladders, ropes or scaffolds, or more than occasional performance of other postural movements (i.e. balancing, climbing ramps/stairs, crawling, crouching, kneeling and stooping); requires no moderate exposure to hazards (e.g. dangerous machinery, unprotected heights); and involves only simple work with no more than occasional interaction with the general public.

R. 17. Furthermore, the ALJ found that Stonestreet's "remaining mental capacities are sufficient to meet the intellectual and emotional demands of at least unskilled, competitive, remunerative

work on a sustained basis." R. 17–18. The ALJ determined that Stonestreet was not capable of performing his past relevant work, but that transferability of job skills was not an issue because he was not disabled under Medical-Vocational Rules 202.21 and 202.14. R. 21–22. Thus, the ALJ concluded that he was not disabled. R. 22. On August 20, 2012, the Appeals Council denied Stonestreet's request for review (R. 1–4), and this appeal followed.

## ANALYSIS

Stonestreet raises two issues in this appeal. First, Stonestreet contends that the ALJ improperly discounted the opinion of a consultative psychologist. Second, Stonestreet argues that the ALJ improperly relied on the Medical-Vocational Guidelines to find that a significant number of jobs existed of which Stonestreet could perform. I find that substantial evidence supports the ALJ's decision on both grounds.

### Consultative Opinion

First, Stonestreet alleges that the ALJ erred in discounting the opinion of psychologist Robert J. Verdile, Ph.D., who Stonestreet contends qualifies as a treating source entitled up to controlling weight under 20 C.F.R. §404.1527(c). The record contains two examination reports from Dr. Verdile, dated October 30, 2008 (R. 418–21) and December 18, 2008. R. 422–33. In each evaluation report, Dr. Verdile reviewed Stonestreet's psychiatric history and conducted a mental status examination, but at the December 2008 evaluation, Dr. Verdile performed more comprehensive cognitive and psychiatric testing. R. 424–31. Dr. Verdile diagnosed Stonestreet with "major depression, severe, recurrent without psychotic features," alcohol dependence, mild cognitive disorder, and a Global Assessment of Functioning of 50.[4] R. 431. The reports contain

---

[4] The Global Assessment of Functioning is a numeric scale ranging from 0 to 100 used by mental health professionals to rate social, occupational and psychological functioning "on a hypothetical continuum of mental health illness." Diagnostic and Statistical Manual of Mental Disorders, 32 (4th Ed. Am. Psychiatric Ass'n 1994) ("DSM IV"). A score of 41–50 suggests serious symptoms or serious impairment in social or occupational

5

no recommendations as to medication or therapy. However, Dr. Verdile provided the same medical source statement regarding Stonestreet's functional abilities after each exam. According to Dr. Verdile, Stonestreet would be limited as follows:

| | |
|---|---|
| Perform detailed and complex tasks | Severe |
| Perform simple and repetitive tasks | Moderate |
| Maintain regular attendance in the work place | Moderate |
| Perform work activities on a consistent basis | Severe |
| Perform work activities without special accommodation or additional supervision | Severe |
| Complete a normal workday or workweek without interruptions from psychiatric condition | Severe |
| Accept instructions from supervisor | Mild |
| Interact with coworkers and the public | Moderate |
| Deal with usual stresses encountered in competitive work | Severe |

R. 420, 432.

The ALJ gave Dr. Verdile's opinion "appropriate weight" but found "that the severe deficiencies noted in performing work consistently and completing a normal workday unsupported by other evidence of record." R. 20. The ALJ called Dr. Verdile's reports a "snapshot" of Stonestreet's functioning and that they "appear[ed] to be an overstatement of the severity of his limitations." R. 20. The ALJ further explained that Dr. Verdile relied primarily on Stonestreet's subjective complaints, and noted that Stonestreet returned to work in 2009 and 2010. Moreover, the ALJ found support for his decision by the fact that Stonestreet had the ability to perform various activities of daily living. The ALJ concluded that "the longitudinal record supports that the claimant can perform work activity" as provided in the RFC, which limited Stonestreet to simple work with no more than occasional interaction with the general public. R. 17–18, 20. I find that the ALJ's evaluation of Dr. Verdile's opinion is supported by substantial evidence.

---

functioning. Id. A score of 51–60 suggests moderate symptoms or difficulty in social or occupational functioning. Id.

Stonestreet's argument is flawed from the outset. Contrary to Stonestreet's contention, Dr. Verdile is properly classified as a nontreating consultative examiner, and not a treating psychologist warranting enhanced deference under the regulations. The regulations state that a "[t]reating source means your own…psychologist…who provides you, or has provided you, with medical treatment or evaluation and who has, or has had, an ongoing treatment relationship with you." 20 C.F.R. § 404.1502. Furthermore, the agency:

> will not consider an acceptable medical source to be your treating source if your relationship with the source is not based on your medical need for treatment or evaluation, but solely on your need to obtain a report in support of your claim for disability. In such a case, we will consider the acceptable medical source to be a nontreating source.

Id.

The record in this case shows that Dr. Verdile saw Stonestreet only twice, and not for treatment, ongoing or otherwise. The examinations by Dr. Verdile were for the purposes of determining disability only, and not based on Stonestreet's medical need for treatment or evaluation. In fact, each report contains an attestation that states that Dr. Verdile was "authorized or contracted by the Disability Determination Services to examine the claimant…and produced a consultative examination report for that claimant." R. 421, 433. Moreover, Stonestreet admits in his brief that "[t]he Commissioner arranged [the] consultative psychological evaluation" by Dr. Verdile. Pl.'s Br. Summ. J. 4. Dr. Verdile's opinion is therefore not entitled to controlling weight, even in the best of circumstances. S.S.R. 96–2p, 1996 WL 374188 at *2 (July 2, 1996) ("[O]pinions from sources other than treating sources can never be entitled to 'controlling weight.'").[5] Instead, Dr. Verdile is properly considered a nontreating source, e.g. a psychologist

---

[5] "Social Security Rulings are interpretations by the Social Security Administration of the Social Security Act. While they do not have the force of law, they are entitled to deference unless they are clearly erroneous or inconsistent with the law." Pass v. Chater, 65 F.3d 1200, 1204 n.3 (4th Cir. 1995) (citing Han v. Bowen, 882 F.2d 1453, 1457 (9th Cir. 1989)).

7

who had examined Stonestreet, but did not have an ongoing treatment relationship with him. 20 C.F.R. § 404.1502.

When making an RFC assessment, the ALJ must assess every medical opinion received into evidence. 20 C.F.R. § 416.927(c). The regulations provide that the opinion of a consultative examiner like Dr. Verdile is given more weight than a medical source that has not examined the claimant. 20 C.F.R. § 416.927(c)(1). However, the ALJ must weigh several factors when evaluating a consultative opinion, such as whether relevant medical evidence supports the opinion, how well explained the opinion is, how consistent the opinion is with the record as a whole, and whether the opinion is from a specialist in the relevant field. 20 C.F.R. § 416.927(c)(3–6). Ultimately, the ALJ must consider the opinions received in light of the evidence of record and the ALJ must determine whether the record supports the opinions offered.

"State agency medical and psychological consultants … are highly qualified physicians, psychologists, and other medical specialists who are also experts in Social Security disability evaluation," and therefore, the ALJ "must consider their findings except for the ultimate determination about whether a claimant is disabled." 20 CFR § 404.1527(e)(2)(i). While an examiner's opinion is generally accorded more weight than a non-examiner's opinion, if an "opinion is not supported by clinical evidence or if it is inconsistent with other substantial evidence, it should be accorded significantly less weight." Mastro v. Apfel, 270 F.3d 171, 178 (4th Cir.2001) (citing Craig v. Chater, 76 F.3d 385, 590) (4th Cir. 1996)). Moreover, "[i]f the RFC assessment conflicts with an opinion from a medical source, the adjudicator must explain why the opinion was not adopted." S.S.R. 96–8p, 1996 WL 374184, *7 (July 2, 1996)). The ALJ's decision "must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave" to the opinion and "the reasons for that weight." S.S.R. 96–2p, 1996 WL 374188, at *5 (July 2, 1996)).

Sparse medical evidence in the record shows any functional loss caused by Stonestreet's depression and alcoholism. During the relevant period since March 2008, Stonestreet has not sought any mental health treatment, and his treatment for alcoholism consisted of attending AA meetings several times a week. R. 42, 437. A medical note from a couple months prior to the alleged onset of disability shows that Stonestreet complained of stress and anger issues to his family doctor, was assessed with depression, and was prescribed the antidepressant Citalopram. R. 414. Records show that he continued to take the medication until at least May 20, 2008 (R. 466), although Stonestreet reported discontinuing it due to finances sometime before September 22, 2008. R. 436. At doctor's visits for his physical impairments in May 2008, Stonestreet's mental status exams were normal. R. 403, 466–68. Stonestreet did not report any decreased memory at that time either. R. 403.

The majority of Stonestreet's mental health history contained in the record comes from Stonestreet's hearing testimony and his subjective reports. In September 2008, in speaking with his disability case worker, Stonestreet reported that he was diagnosed with bipolar disorder around 1993, but had not sought mental health treatment since that time. R. 436–37. Stonestreet said he felt like he was going "nuts" and that he couldn't stand to be around other people. R. 437. Stonestreet also explained that his memory "comes and goes," although during the conversation the case worker noted that Stonestreet did not have any difficulty with memory, recalling distant dates and names. R. 437. When asked how often he was able to work in his garden, Stonestreet initially stated "he could go out there quite a bit but retracted that immediately stating his back hurt so bad." R. 427.

At the administrative hearing, Stonestreet testified that he did not have any psychiatric hospitalizations or outpatient treatment since March 19, 2008. R. 44. Stonestreet stated that he had not consumed alcohol in nine and a half months. R. 45. Stonestreet explained that friends

still visited him and that he didn't mind being around them, but after a while he "can't wait for them to leave." R. 48. Stonestreet explained that he quit his job as a forklift operator in March 2008 because of the stress caused by his supervisor, and that he was laid off from his job as a lab tech at an asphalt company in 2009. R. 50–51. As to his memory problems, Stonestreet said that he needed written reminders to run errands such as getting a loaf of bread at the grocery store. R. 51.

Stonestreet reported to Dr. Verdile that he began to abuse alcohol in early adolescence, and that alcohol was self-medication for stress. R. 422–23. Stonestreet stated that he left his job in March 2008 because of his physical limitations, but that "spurts of anger interfered with job performance." R. 423. On both occasions, Dr. Verdile found Stonestreet depressed and sad, that he rambled, had suicidal ideations, and had poor insight and judgment. R. 419, 423–24. However, Stonestreet's speech was normal, he was properly oriented, he denied hallucinations or delusions, and his self-perception was intact. R. 419, 423–24. Dr. Verdile found that, based on IQ testing, Stonestreet's overall cognitive ability was in the average range. R. 428. Furthermore, Stonestreet's scores on the Working Memory Index were also in the average range. R. 428. Dr. Verdile noted that Stonestreet's "[p]rognosis is poor given chronicity of depression and alcoholism and lack of resources." R. 431. Despite these relatively benign test results, Dr. Verdile provided a medical source statement suggesting severe limitations in Stonestreet's ability to do things like perform work activities on a consistent basis and deal with the stressors of competitive work. R. 432.

State agency physician Robert Chaplin, M.D. reviewed Stonestreet's history at the initial level, which included the consultative opinion of Dr. Verdile. R. 56–76. Dr. Chaplin found that Stonestreet would be moderately limited in: understanding, remembering, and carrying out detailed instructions; maintaining attention and concentration for extended periods; working in

coordination with or in proximity to others without distraction; interacting appropriately with the general public; accepting instructions and responding appropriately to criticisms from supervisors; getting along with co-workers or peers without distracting them or exhibiting behavioral extremes; responding appropriately to changes in the work setting; and setting realistic goals or making plans independently of others. R. 69–72. However, Dr. Chaplin found that Stonestreet would not be significantly limited in all other spheres of mental functioning considered. In explaining why these findings were different from Dr. Verdile's, Dr. Chaplin noted that:

> [Dr. Verdile's] opinion relies heavily on the subjective report of symptoms and limitations by the individual, and the totality of the evidence does not support the subjective complaints. The evidence provided by [Dr. Verdile] reveals only a snapshot of the individual's functioning and is an overestimate of the severity of the restrictions/limitations.

R. 72–73. On reconsideration, state agency psychologist Dr. John Kalil made identical findings regarding Stonestreet's mental RFC, and similarly discounted the opinion of Dr. Verdile. R. 78–91.

This record provides substantial evidence to support the ALJ's weighing of Dr. Verdile's opinion. Stonestreet isolates only "two pieces of evidence" cited by the ALJ in support of discounting the opinion of Dr. Verdile: Stonestreet's performance of activities of daily living and his continued work past the alleged onset date. Pl.'s Br. Summ. J. 14. However, this neglects the ALJ's most significant support—the fact that the longitudinal record failed to support a finding of mental limitation greater than what was provided for in the RFC. R. 20. Notably, Stonestreet did not seek or receive any mental health treatment during the relevant period. Other than Dr. Verdile's mental status examinations, reviews of Stonestreet's mental health were unremarkable, including a note that indicates Stonestreet did not have decreased memory. R. 403, 466–68.

11

In light of the sparse independent evidence and the nature of the reports, I concur with the ALJ and both state agency evaluators that Dr. Verdile's findings appear to be based primarily on the subjective reports of Stonestreet. The only objective testing regarding Stonestreet's mental abilities came from Dr. Verdile himself in the form of IQ and memory proficiency testing. Yet Dr. Verdile measured Stonestreet's ability in the average range overall for both IQ and memory, findings not suggestive of disability. R. 428. Setting aside this objective testing leaves little more than Stonestreet's subjective complaints in support his claim that he has significant mental limitations.

Stonestreet's subjective complaints of disabling symptoms are not conclusive. The ALJ must examine all of the evidence and determine whether Stonestreet has met his burden of showing that he suffers from an underlying impairment which is reasonably expected to produce his claimed symptoms. See Craig v. Chater, 76 F.3d 585, 592–93 (4th Cir. 1996). Pieces of evidence properly considered in this regard are Stonestreet's reported activities of daily living and ability to work after the alleged onset period. Stonestreet reported at points during the alleged disability period that he was able to drive a car, prepare meals, go to church, go shopping, cut the grass, look for jobs, and feed his dogs. R. 33, 36, 40–42, 230–34, 437. In addition, Stonestreet reported that he went to AA meetings at least three or four days a week. R. 42, 437. Stonestreet initially told his disability case worker that he tended to his family's garden "quite a bit" but then quickly recanted. R. 437. While perhaps sufficient by themselves to discount Dr. Verdile's opinion, these activities suggesting mild limitations provided context in which to view the credibility of Stonestreet's claim.

Further undermining Stonestreet's claim is the fact that he continued working for periods well after the date of alleged onset of disability. See, e.g., Childers v. Astrue, 1:09CV225, 2012 WL 1267897, at *10 (M.D.N.C. Apr. 16, 2012) ("Plaintiff's continued work ... long after her

alleged onset date, documented throughout the record ... represents the most significant evidentiary conflict."). Stonestreet worked as a lab technician for Loudoun County Asphalt between March and June 2009, and testified that he worked with three others, carrying buckets of asphalt of roughly 30 or 40 pounds. R. 33, 51–52. Tellingly, Stonestreet testified that he was laid off from this job, and not that he left because of any disability. R. 51. Moreover, Stonestreet briefly worked at two other temporary jobs during the relevant period. R. 33. This history of continued work supports the ALJ's finding that Stonestreet's symptoms were not as severe as alleged and that Stonestreet retained the ability to work.

When considering Dr. Verdile's opinion, the ALJ properly noted the inconsistent longitudinal record, Stonestreet's reported activities of daily living, and the fact that Stonestreet continued to work following his alleged onset of disability. The ALJ found that Stonestreet's symptoms cause "moderate deficiencies in social functioning and concentration, persistence and pace," (R. 20) and accommodated those deficiencies by restricting Stonestreet to "simple work with no more than occasional interaction with the general public." R. 17. This decision reflects that the ALJ considered the relevant factors under the regulations for evaluating opinion evidence. See 20 C.F.R. § 416.927(c)(3–6). Substantial evidence supports the ALJ's final RFC and his decision to discount Dr. Verdile's consultative opinion as unsupported in the record. Moreover, the ALJ's decision was sufficiently specific for this Court to review the reasons for the weight given to Dr. Verdile's opinion. Accordingly, I find that remand is not warranted on this ground.

**Medical-Vocational Guidelines**

Stonestreet next argues that the ALJ erred in his reliance on the Medical-Vocational Guidelines (hereinafter "grid tables") when determining that Stonestreet retained the ability to work. Stonestreet contends that he has non-exertional limitations, as found by Dr. Verdile, which

preclude reliance on the grid tables and which required a vocational expert to determine if substantial jobs exist which he could perform. I disagree, and find that substantial evidence supports the ALJ's decision at step five.

The Commissioner bears the burden at step five to show the existence of a significant number of jobs in the national economy that a claimant can perform given his RFC. To aid in making this determination, the Commissioner promulgated the grid tables located at 20 C.F.R. Part 404, Subpart P, Appendix 2. Washington v. Astrue, 698 F. Supp. 2d 562, 571 (D.S.C. 2010). The grids are tables that "indicate the proper disability determinations for various combinations of age, education, and previous work experience in conjunction with the individual's residual functional capacity…." Hall v. Harris, 685 F.2d 260, 265 (4th Cir. 1981). Each grid, however,

> considers only the strength or exertional component of a claimant's disability in determining whether jobs exist that the claimant is able to perform in spite of his disability. Thus, in cases where pain occurs only upon exertion and limits one's strength functioning, the grid tables will apply. But when a claimant suffers from both exertional and nonexertional limitations, the grid tables are not conclusive but may only serve as guidelines.

Walker v. Bowen, 889 F.2d 47, 49 (4th Cir.1989) (citing Wilson v. Heckler, 743 F.2d 218 (4th Cir. 1984)). When the Commissioner is unable to rely on the grids in making the step five determination, he must use a vocational expert to prove that jobs exist in the national economy which the claimant can perform. Walker, 889 F.2d at 49–50.

The Fourth Circuit has held that "not every malady of a 'nonexertional' nature rises to the level of a 'nonexertional impairment'" so as to preclude the use of the grid tables. Smith v. Schweiker, 719 F.2d 723, 725 (4th Cir. 1984) (per curiam) (citing Grant v. Schweiker, 699 F.2d 189 (4th Cir.1983)). "If the grids are to serve their intended purpose…their use cannot be defeated by low-level personality and emotional disorders that undoubtedly afflict—at least from

14

time to time—vast numbers of the populace." Smith, 719 F.2d at 725. Thus, the proper inquiry is whether the nonexertional condition affects an individual's residual functional capacity to perform work of which he is exertionally capable. Walker, 889 F.2d at 49. If not, the Commissioner may properly rely on the grids to sustain the burden at step five of proving the existence of jobs the plaintiff can perform. Hammond v. Heckler, 765 F.2d 424, 425-26 (4th Cir. 1985). "This inquiry is a question of fact and is therefore reviewed by this court only to evaluate if the finding is supported by substantial evidence." Long v. Apfel, 2000 WL 1469542, at *4 (W.D. Va. Aug. 23, 2000).

In this case, the ALJ found that Stonestreet retained the capacity to perform a range of unskilled, light work with additional postural, environmental and mental limitations. R. 17. At step five, the ALJ considered Medical-Vocational Rules 202.21 and 202.14, which directed a finding of non-disability with Stonestreet's age, education, and work experience.[6] The ALJ found that the "additional limitations are an insufficient compromise on the full range of light work and therefore have little or no effect on the occupational base of unskilled work."[7] R. 22. Therefore, the ALJ found that jobs existed in significant numbers in the national economy that Stonestreet could perform. R. 21.

Stonestreet does not allege that the postural and environmental limitations eroded the light, unskilled work occupational base. Instead, Stonestreet again relies on the opinion of Dr. Verdile reflecting on his alleged mental limitations. However, substantial evidence supports the finding that Stonestreet's nonexertional maladies of alcoholism and depression did not significantly affect his ability to perform work light work, therefore leaving his occupational

---

[6] The ALJ found that the transferability of job skills was not a material factor under either Medical-Vocational rule considered (R. 21); Stonestreet does not place this finding in dispute.

[7] The grid tables take administrative notice of the availability of 1,600 unskilled occupations at the light and sedentary exertional levels. S.S.R. 83-14, 1983 WL 31254, at *6. This is the initial relevant occupational base in light of Stonestreet's RFC.

15

base insignificantly affected. As discussed above, the longitudinal record does not support Stonestreet's contention that his nonexertional impairments significantly affected his ability to perform unskilled work at the light exertional level. The ALJ was correct in that Dr. Verdile's evaluations were a "snapshot" in time and not indicative of sustained mental limitations. State agency evaluators Drs. Chaplin and Kalil both found Stonestreet not disabled (R. 72–73, 78–91) and Stonestreet's subjective complaints are undermined by his activities of daily living and his work performed after the alleged onset of disability.

Although the evidence established that Stonestreet experienced some functional limitation from his nonexertional mental impairments, I find that they fall short of an impairment which would preclude use of the grid tables. Moreover, the RFC appropriately accommodated these limitations. For these reasons, I find that substantial evidence supports the ALJ's decision to rely on the grid tables at step five when determining that a significant number of jobs existed in the national economy that Stonestreet could perform.

## **CONCLUSION**

It is not the province of the court to make a disability determination. The Court's role is limited to determining whether the Commissioner's decision is supported by substantial evidence, and in this case, substantial evidence supports the ALJ's opinion. In recommending that the final decision of the Commissioner be affirmed, I do not suggest that Stonestreet is totally free from any distress. The objective medical record simply fails to document the existence of conditions which would reasonably be expected to result in total disability from all forms of substantial gainful employment. It appears that the ALJ properly considered all of the objective and subjective evidence in adjudicating Stonestreet's claim for benefits and in determining that his physical and mental impairments would not prevent him from performing

any work. It follows that all facets of the Commissioner's decision in this case are supported by substantial evidence. Accordingly, I recommend that the Commissioner's decision be affirmed, the defendant's motion for summary judgment be **GRANTED**, and Stonestreet's motion for summary judgment be **DENIED**.

The Clerk is directed to transmit the record in this case to Michael F. Urbanski, United States District Judge, and to provide copies of this Report and Recommendation to counsel of record. Both sides are reminded that pursuant to Rule 72(b), they are entitled to note any objections to this Report and Recommendation within fourteen (14) days hereof. Any adjudication of fact or conclusion of law rendered herein by me that is not specifically objected to within the period prescribed by law may become conclusive upon the parties. Failure to file specific objections pursuant to 28 U.S.C. § 636(b)(1)(C) as to factual recitations or findings as well as to the conclusion reached by me may be construed by any reviewing court as a waiver of such objection.

Enter: February 17, 2014

*Robert S. Ballou*

Robert S. Ballou
United States Magistrate Judge